IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATE OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 05-00371-01-CR-W-DW |
| | ) | |
| JOSE LOPEZ-LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS OBTAINED ON OCTOBER 18, 2005

Before the court is Defendant's Motion to Suppress Evidence and Statements Obtained on October 18, 2005, on the grounds that the statements and evidence were obtained in violation of the Fourth, Fifth and Eighth Amendments. Defendant moves the court to suppress statements made to law enforcement officers, arguing that he was not initially advised of his Miranda rights and, even after he was, that he did not voluntarily waive such rights. He also moves the court to suppress evidence seized during a consent search of his apartment on the basis that consent was not voluntarily given.

## I. BACKGROUND

On October 18, 2005, Detective John Howe and two uniformed Kansas City, Missouri, police officers arrested Defendant at his residence. Defendant was taken into custody, handcuffed, and searched. While the driver of the transport vehicle was counting money recovered from the search of Defendant's person, Detective Howe asked Defendant whether he had anything illegal in his

1

apartment. Defendant responded that he did not. Detective Howe then asked for consent to search the apartment and Defendant verbally agreed.

Within minutes after giving consent, Defendant spontaneously stated he wanted to be honest and that he did, in fact, have methamphetamine inside his apartment. Detective Howe read Defendant his Miranda rights. He then asked Defendant again whether he had methamphetamine in his apartment, to which Defendant replied that he did. Defendant also gave consent for police to search his apartment. After obtaining consent, Detective Howe moved Defendant in front of a patrol car where he used the car's video camera to memorialize Defendant's waiver and consent.

Defendant next escorted the officers into his apartment and directed them to a leather jacket hanging in the closet of his bedroom. Defendant told them that there was methamphetamine inside the jacket's pocket. He also pointed out scales on his dresser. The officers seized both the methamphetamine and the scales.

Defendant filed the instant motion to suppress evidence and statements on May 8, 2006 (Doc. No. 59). The government responded to Defendant's motion on May 24, 2006 (Doc. No. 66). On May 25, 2006, I conducted an evidentiary hearing. The government appeared by Assistant United States Attorney Paul S. Becker. Defendant was present, represented by appointed counsel John Gromowsky. The government called Independence, Missouri Police Department Detective John Howe to testify. Defendant testified on his own behalf. In addition, the following exhibits were marked and admitted into evidence:

Government's Exhibit 1:     Affidavit and Application for Search Warrant
Government's Exhibit 2:     Search Warrant
Government's Exhibit 4:     Miranda Waiver Form
Government's Exhibit 5:     Consent to Search Form, dated 09/29/05
Government's Exhibit 6:     Video from Patrol Car - re: Consent, dated 10/18/05

Government's Exhibit 8:      CD - Audio Files of Interviews on 09/29/05

Defendant's Exhibit 1:      Stipulation re: Diagnosis of Dr. John Wisner

At the close of the hearing, I requested that the parties provide me a copy of the return made on the warrant, police reports reflecting the items seized on both September 29, 2005, and October 18, 2005, and a copy of the video taken from the back of the transport vehicle (Tr. at 63-67). Upon receipt, I marked the following exhibits and admitted them into evidence without objection (Doc. No. 75):

| | |
|---|---|
| Court's Exhibit 1: | Motion and Order Sealing 09/29/05 Search Warrant |
| Court's Exhibit 2: | Jackson County Drug Task Force Supplemental Report re: Obtaining Search Warrant for 4622 E. 31st Street, Kansas City, Missouri |
| Court's Exhibit 3: | Return Receipt for Search Warrant |
| Court's Exhibit 4: | Jackson County Drug Task Force Supplemental Report re: Search Warrant Execution, dated 09/29/05 |
| Court's Exhibit 5: | Jackson County Drug Task Force Supplemental Report re: Jose Lopez-Lopez [1st] Interview, dated 09/29/05 |
| Court's Exhibit 6: | Jackson County Drug Task Force Supplemental Report re: Manuel Ramos-Avila Interview, dated 09/29/05 |
| Court's Exhibit 7: | Jackson County Drug Task Force Supplemental Report re: Jose Lopez-Lopez [2nd] Interview, dated 09/29/05 |
| Court's Exhibit 8: | Jackson County Drug Task Force Supplemental Report re: Consent Search of 4622 E. 31st Street, Kansas City, Missouri, dated 09/29/05 |
| Court's Exhibit 9: | Jackson County Drug Task Force Chain of Custody Report, dated 09/29/05 |
| Court's Exhibit 10: | Independence Missouri Police Department Physical Evidence Examination Request, dated 09/29/05 |
| Court's Exhibit 11: | Jackson County Drug Task Force Digital Media Information Sheet |
| Court's Exhibit 12: | Jackson County Drug Task Force Supplemental Report re: Jose Lopez-Lopez [3nd] Interview, dated 09/29/05 |
| Court's Exhibit 13: | Arrest Warrant, United States District Court - Western District of Missouri, signed 10/18/05 |
| Court's Exhibit 14: | Jackson County Drug Task Force Supplemental Report re: Arrest of Jose Lopez-Lopez, dated 10/18/05 |
| Court's Exhibit 15: | Jackson County Drug Task Force Chain of Custody Report |
| Court's Exhibit 16: | Independence Missouri Police Department Physical Evidence Examination Request, dated 10/18/05 |
| Court's Exhibit 17: | Photocopies of seized money |

3

Court's Exhibit 18:    Video from Transport Vehicle - re: Consent, dated 10/18/05

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing and the exhibits submitted thereafter, I submit the following findings of fact:

1.    On September 29, 2005, the Jackson County Drug Task Force executed a search warrant at 4622 East 31st Street in Kansas City, Missouri (Tr. at 4; Court's Exh. 4). At approximately 6:26 p.m., the tactical squad (composed of approximately twelve to fourteen total officers and detectives) approached the residence and knocked several times on the front door (Tr. at 5, 30; Court's Exh. 4). When no one answered, they made entry into the apartment (Tr. at 5; Court's Exh. 4).

2.    Upon entering the apartment, the tactical team encountered Defendant as he was coming out of the bedroom (Tr. at 5). Defendant was immediately handcuffed and taken into custody (Tr. at 6, 30). He was then escorted out of the apartment and onto the front porch (Tr. at 6; Court's Exh. 4). Sergeant Hamilton stood with Defendant on the stoop of the front porch where Defendant sat handcuffed (Tr. at 6, 31).

3.    The tactical team conducted an initial sweep of the apartment (Tr. at 6). They found a small amount of marijuana and observed three firearms between the mattress and the box springs of the bed that was against the north wall (Tr. at 6, 17). They did not find plates with methamphetamine in every room of the apartment (Tr. at 57-58).

4.    Detective John Howe was located directly south of the apartment at the base of the driveway when the tactical team entered the residence (Tr. at 5). At approximately 6:40 p.m., when the team finished sweeping the apartment, Detective Howe and

4

Detective Rigot approached Defendant and Sergeant Hamilton on the front porch (Tr. at 6, 31). Sergeant Hamilton advised Detective Howe that Defendant had been taken into custody as he was exiting the bedroom in the one-bedroom apartment (Tr. at 6, Court's Exh. 4). He also told Detective Howe that a preliminary sweep of the apartment revealed several firearms between the mattress and the box springs of the bed (Tr. at 6; Court's Exh. 4).

5.  Detective Howe identified himself to Defendant, advised him of the search warrant, and asked Defendant for identification (Tr. at 6; Court's Exh. 4). Defendant stated that he did not have any formal identification but verbally identified himself to the detectives (Tr. at 6; Court's Exh. 4). When asked about his immigration status, Defendant indicated he was in the United States legally (Tr. at 6; Court's Exh. 4). Detectives Howe and Rigot then escorted Defendant fifty to seventy-five feet to Detective Howe's task force vehicle on the street (Tr. at 6-7).

6.  When they arrived at the vehicle, Defendant got in the front passenger's seat (Tr. at 7). Detective Howe sat in the driver's seat and Detective Rigot sat in the rear right seat behind Defendant (Tr. at 7). Detective Howe looked for his digital recorder and learned that the batteries were dead (Tr. at 7). He got back out of the vehicle and contacted Detective Phillips to ask if he could use Detective Phillips' recorder (Tr. at 7).

7.  Detective Howe then got back into his vehicle and began filling out preliminary information sheets on Defendant (Tr. at 7; Court's Exh. 4). The information sheets

requested Defendant's name, date of birth, address, basic identifiers, and relatives; they did not seek any incriminating information (Tr. at 7-8).

8.     At approximately 6:50 p.m., ten minutes after Detective Howe initially made contact with Defendant on the front porch, Defendant was advised of his rights under the Constitution (Tr. at 7-8, 31). Between the time of initial contact and the time Defendant was <u>Mirandized</u>, Detective Howe only received the details from Sergeant Hamilton concerning Defendant's apprehension, obtained Defendant's name and date of birth, asked Defendant preliminary questions about his immigration status, and escorted Defendant to his vehicle were he filled out the information sheets (Tr. at 8).

9.     Detective Howe recorded a start time of "1850" at the top of a preprinted Jackson County Drug Task Force <u>Miranda</u> waiver form and then proceeded to read Defendant his <u>Miranda</u> rights in English (Tr. at 8-9, 33). Detective Howe did not offer Defendant the opportunity to have the form read in Spanish because Defendant had indicated that he could read and write the English language; Detective Howe believed Defendant's primary language to be English (Tr. at 33).

10.    After he read the waiver form verbatim to Defendant, Detective Howe gave the form to Defendant (Tr. at 8-9). Defendant read the form back to Detective Howe aloud and wrote his initials after each of the rights enunciated therein (Tr. at 8-9, Gvt. Exh. 4). Defendant checked the "yes" box beside the portion of the waiver form that read, "I've read this statement of my rights. It's been read to me. I understand what my rights are." (Tr. at 10; <u>see</u> <u>also</u> Gvt. Exh. 4). He also answered "yes" to the question that read, "Having these rights in mind, do you still wish to talk to us now?" (Tr. at

6

10, Gvt. Exh, 4).  Defendant indicated by placing his initials in blanks on the form that he (a) could  read and write the English language, (b) had completed nine years of school, (c) was not currently under the influence of drugs or alcohol, and that (d) his judgment was not impaired (Tr. at 10, Gvt. Exh. 4; Court's Exh. 5).  He ultimately signed and dated the <u>Miranda</u> waiver form at 6:53 p.m. (Tr. at 31, Gvt. Exh. 4; Court's Exh. 5).  Defendant was either handcuffed in the front or not handcuffed at all when filling out the waiver form (Tr. at 10).

11.   The conversation between Detective Howe and Defendant in which Detective Howe obtained Defendant's identifying information and Defendant executed the <u>Miranda</u> waiver form was conducted in the English language (Tr. at 10-11).  Defendant responded to all of Detective Howe's questions appropriately and answered in English (Tr. at 11).  At no time did Defendant indicate he would be more comfortable speaking in Spanish (Tr. at 11).

12.   Defendant testified at the suppression hearing that although he initialed the statement on the <u>Miranda</u> waiver form indicating he could read and write the English language, he did not understand what it said (Tr. at 80-81).

13.   After Defendant waived his <u>Miranda</u> rights, Detective Howe began to interview Defendant about his methamphetamine trafficking (Tr. at 11).  Defendant reported using methamphetamine and stated he used approximately an eightball (3.5 grams) everyday for the last year (Tr. at 11-12, 32; Court's Exh. 4; Court's Exh. 5).  Defendant further stated that he used so much methamphetamine he did not know what he was doing half of the time (Tr. at 32, 33; Court's Exh. 4; Court's Exh. 5).

7

He did not specifically exclude September 29, 2005, from this description of drug use (Tr. at 33). However, when Detective Howe asked Defendant if he was currently under the influence, Defendant responded "no" (Court's Exh. 4).

14. Detective Howe has been employed with the Independence Police Department since 1988, and has been a detective since March of 2002 (Tr. at 3-4). Prior to interviewing Defendant, Detective Howe had interviewed hundreds of individuals who were either methamphetamine users or who were under the influence of methamphetamine at the time of the interview (Tr. at 12). Based on these experiences, Detective Howe could easily tell whether an interviewee was just a user or if he or she was high at the time of the interview (Tr. at 12). Detective Howe testified that during the interview of Defendant conducted at approximately 6:50 p.m. on September 29, 2005, Defendant appeared to be user but did not give any indication he was actually high (Tr. at 12). In addition to Defendant's own statement that he used methamphetamine, Defendant's general appearance, sunken-in face and eccentric movements led Detective Howe to believe he was a user (Tr. at 12-13).

15. At approximately 7:06 p.m., Detective Phillips brought his digital handheld recorder to Detective Howe and Detective Howe began recording his interview with Defendant (Tr. at 13, 32). Detective Howe did not re-Mirandize Defendant after he began recording; however, he did ask Defendant whether he had been read his Miranda rights and had previously agreed to speak with him (Tr. at 13, Gvt. Exh. 8). Defendant replied, "yes" (Gvt. Exh. 8). The preceding thirteen minutes of the interview were not recorded (Tr. at 32).

8

16.    The entire interview was conducted in English (Tr. at 15, 33; Gvt. Exh. 8).  At no time during the interview did Defendant attempt to speak in Spanish (Tr. at 15).  Defendant never indicated that he needed to speak in Spanish to be understood (Tr. at 22).  Detective Howe did not offer Defendant a translator (Tr. at 37).

17.    At approximately 7:30 p.m., a Grand Marquis arrived at Defendant's residence (Tr. at 15; Court's Exh. 4).  The car pulled into the driveway behind Detective Howe's car (Tr. at 16).  Both Detective Howe and Sergeant Cameron approached the vehicle (Tr. at 16).  Detective Howe approached the driver's side, at which time he observed an open bottle of beer (Tr. at 16; Court's Exh. 4).  The officers asked the driver, who was later identified as Manuel Ramos-Avila, to exit the vehicle (Tr. at 16; Court's Exh. 4).  As he was doing so, Mr. Ramos-Avila placed his right hand out of view (Tr. at 16; Court's Exh. 4).  When the officers pulled him from the vehicle, a handgun fell onto the seat (Tr. at 16; Court's Exh. 4).  Mr. Ramos-Avila was taken into custody at that time (Tr. at 16; Court's Exh. 4).

18.    Later that night, Detective Howe interviewed Mr. Ramos-Avila to obtain any information he might have about Defendant (Tr. at 16-17).  Mr. Ramos-Avila stated he had purchased the small amount of methamphetamine that had been found in his vehicle from Defendant earlier that day at Defendant's residence (Tr. at 17; Court's Exh. 6).  At the time he made the purchase, Mr. Ramos-Avila observed approximately one once of methamphetamine in Defendant's possession (Tr. at 17; Court's Exh. 6).  Mr. Ramos-Avila also stated that when he and Defendant were placed in the same cell in the Detention Unit, Defendant told him that police had not

9

found anything in his apartment because he had it hidden in a wall (Tr. at 17; Court's Exh. 6).

19. Detective Howe re-interviewed Defendant on September 29, 2005, at approximately 10:10 p.m. in order to obtain consent to search his apartment (Tr. at 17-18; Court's Exh. 7). This second interview occurred in an office in the Drug Enforcement Unit at the Independence Police Department and was recorded (Tr. at 18). Detectives Howe and Rigot conducted the interview (Tr. at 45). Defendant was advised of his Miranda rights at the inception of the interview and again agreed to speak with the detectives (Tr. at 18, Gvt. Exh. 8; Court's Exh. 7). Defendant was not asked to execute another Miranda waiver form since he had already signed one earlier that evening and because the recording contained a verbatim reading of the Miranda warnings (Tr. at 18; Court's Exh. 7).

20. The second interview was also conducted in English (Tr. at 19; Gvt. Exh. 8). Defendant did not indicate that he needed to speak in Spanish to be understood (Tr. at 22). Detective Howe did not offer Defendant a translator (Tr. at 37).

21. Before presenting Defendant with the consent form, Detective Howe told Defendant that police were looking for identification paperwork, although they intended to look for methamphetamine (Tr. at 19, 39; Court's Exh. 7). Specifically, Detective Howe said that he had skimmed over the documents while at Defendant's home initially but failed to recover them and wanted to go back to retrieve them (Tr. at 42-43, 56; Gvt. Exh. 8). Detective Howe had not actually skimmed the documents himself, however; they were skimmed by other detectives on the scene (Tr. at 46).

10

22.     Detective Howe also told Defendant that he knew there was no dope in the apartment (Tr. at 44; Gvt. Exh. 8). He did not tell Defendant that Mr. Ramos-Avila had already told police that Defendant kept drugs and paraphernalia in his residence (Tr. at 38). Detective Howe testified that he was unsure, legally, how much he needed to tell Defendant (Tr. at 19, 38).

23.     In obtaining Defendant's consent for police to search Defendant's residence, Detective Howe asked Defendant if he could read English (Gvt. Exh. 8). Defendant responded that he could, and Detective Howe gave him the Independence Police Department Consent to Search Form (Gvt. Exh. 8). Detective Howe then read the form to Defendant verbatim (Tr. at 19; Gvt. Exh. 8). It is Detective Howe's practice to always read consent forms to persons asked to give consent to ensure they understand what the form says (Tr. at 37). The form authorized police to seize "any letters, papers, materials, contraband, or other property which they may desire"; he never specifically mentioned methamphetamine or drugs (Tr. at 19, 44; Gvt. Exh. 5). Detective Howe did not ask whether Defendant understood what the word "contraband" meant (Tr. at 45). Independent of reading the consent form to Defendant, Detective Howe told Defendant five separate times that police wanted to search his apartment for "illegal items" (See Gvt. Exh. 8).

24.     Detective Howe told Defendant to sign the form if he agreed, and explained to Defendant that he could refuse consent (Tr. at 46; Court's Exh. 7; Gvt. Exh. 8). He also told Defendant that police could obtain another search warrant to search his apartment (Tr. at 46; Gvt. Exh. 8). Detective Howe specifically stated he could not

promise Defendant anything (Gvt. Exh. 8). After executing the form, Defendant was returned to the Detention Unit (Tr. at 19-20; Court's Exh. 7).

25. Defendant testified at the suppression hearing that, when obtaining his consent, the detectives did not tell him they were going to search for drugs (Tr. at 74). Instead, Defendant stated they told him they needed to retrieve a letter in order to verify his identity (Tr. at 74). Based on this representation, Defendant testified he signed the consent form to allow the detectives access to his apartment to pick up the letter (Tr. at 74-75).

26. After obtaining consent, Detective Howe and Detective Rigot returned to Defendant's residence (Tr. at 20). While en route, Detective Howe contacted the Detention Unit and asked them to inform Defendant that if, at any time, he wanted to revoke his consent to let them know (Tr. at 20; Court's Exh. 8). If Detective Howe were so notified, he testified he would have stopped the search (Tr. at 20).

27. Detective Howe entered Defendant's apartment through the front door (Tr. at 20). He searched the apartment, specifically focusing on the bedroom (Tr. at 20). Detectives Howe and Rigot recovered methamphetamine hidden in a Kleenex box on the night stand next to the bed and some drug paraphernalia located inside a black Radio Shack bag hidden inside the wall behind a picture (Tr. at 21, 47; Court's Exh. 8). The drugs were not exposed in either location (Tr. at 48). The identifying documents the detectives told Defendant they were searching for were not found (Tr. at 39-41, 47; see Court's Exh. 8, Court's Exh. 9).

12

28.     After completing the search, Detective Howe went back to the drug unit to interview Defendant a third time (Tr. at 21; Court's Exh. 12). The interview began at approximately 11:46 p.m., and was recorded (Tr. at 21). Detective Howe began the interview by advising Defendant of his <u>Miranda</u> rights (Tr. at 21, Gvt. Exh. 8; Court's Exh. 12). Defendant waived his <u>Miranda</u> rights and stated he gave consent to search his apartment voluntarily (Gvt. Exh. 8). He also stated that at the time he signed the consent form, he knew the detectives had talked to Mr. Ramos-Avila, that Mr. Ramos-Avila had told them about the drugs in Defendant's apartment, and that he knew what would happen when police searched his apartment (Gvt. Exh. 8, Third Interview at 19:31). When asked why he consented if he knew they would find drugs, Defendant answered that he "didn't care" and wanted to be honest (Gvt. Exh. 8). The entire interview was conducted in English (Tr. at 21). Defendant did not indicate that he needed to speak in Spanish to be understood (Tr. at 22). Detective Howe did not offer Defendant a translator (Tr. at 37).

29.     Defendant testified at the suppression hearing that he only understood the portion of the warning which stated, "you have the right to remain silent" (Tr. at 83). Defendant stated that he used methamphetamine all of the time; everywhere he walked in his apartment he was doing a line (Tr. at 36; Gvt. Exh. 8; Court's Exh. 12). Detective Howe did not believe Defendant's statements about drug use referenced the time frame during which the search warrant was executed; he believed Defendant was talking about his methamphetamine use in general (Tr. at 36).

13

30.   A Spanish to English, English to Spanish translator could have been called to the scene during the second and third interviews that took place at the police station (Tr. at 22, 34). However, Detective Howe testified that it was obvious after speaking with Defendant that a translator was not needed (Tr. at 22).

31.   Defendant testified the detectives spoke to him on September 29, 2005, about cooperating in other investigations (Tr. at 75, 76). He said the detectives promised him that, if he acted as a snitch, they would provide him money to buy drugs from other individuals (Tr. at 75). Defendant was sure if he cooperated he would be given his freedom (Tr. at 75). Defendant stated that these promises were made to him before the interviews were conducted that day (Tr. at 76).

32.   The police did not make any threats or promises to Defendant in any of their three conversations on September 29, 2005 (Tr. at 22, 49, 51; see Gvt. Exh. 8). Defendant admitted to such at the conclusion of the third interview (Gvt. Exh. 8; Court's Exh. 12). Although Defendant did ask several times during the interviews whether he would be let go, the respective officer(s) told him that he needed to be honest and that they would go from there (Tr. at 22, 49-50; Gvt. Exh 8). Detective Howe further stated he could not make Defendant any promises (Tr. at 49-50). When Defendant asked, "You want to let me go?", Detective Rigot stated "We do." (Tr. at 50, Gvt. Exh. 8). Despite Defendant's statements to the effect of, "You say you're going to work with me if I work with you.   You say you're going to help me, right?", the detectives continued the interviews (Tr. at 51). Defendant was released the morning of September 30, 2005, pending further investigation (Tr. at 22).

14

33. Occasionally during the three interviews, Detective Howe raised his voice in talking to Defendant and used obscene language (Tr. at 49; see Gvt. Exh. 8). He did so because Defendant would get off the topic or wanted to dominate the conversation (Tr. at 49).

34. Defendant further testified that he was afraid during the interviews because he had "never been in th[o]se things before" (Tr. at 75). He stated he had only previously committed misdemeanors and that he had never before sold drugs (Tr. at 75, 77). However, on cross-examination, Defendant admitted he had "probably" been convicted of illegal reentry into the United States in 1984, and was deported from the country on November 7, 1991 (Tr. at 77-78). He did not remember being convicted of the sale or transportation of a controlled substance in 1991, and denied a 1992 conviction for the sale or transportation of a controlled substance and a 1999 conviction for felony possession of a controlled substance (Tr. at 78).

35. On October 18, 2005, the Federal Grand Jury returned an indictment charging Defendant with being a drug user in possession of a firearm (Tr. at 23). After being advised that a federal warrant for Defendant's arrest had been signed, Detective Howe and two uniformed Kansas City, Missouri police officers observed Defendant in the driveway of his residence (Tr. at 23; Court's Exh. 14). At approximately 5:03 p.m., the three officers pulled into the driveway to place Defendant under arrest (Tr. at 23; Court's Exh. 14). When Defendant made eye contact with Detective Howe, Defendant started to flee (Tr. at 23; Court's Exh. 14). The officers then chased Defendant inside his apartment and caught him approximately two feet inside the

15

doorway (Tr. at 24; Court's Exh. 14). The screen door to Defendant's apartment was shut and appeared to have been unlocked, but the interior door was open (Tr. at 24).

36.    After catching Defendant, Detective Howe handed Defendant off to the two uniformed officers (Tr. at 24). Defendant was placed in handcuffs (Tr. at 51). Another Hispanic male was observed sitting inside the apartment on the couch (Tr. at 24; Court's Exh. 14). The officers asked this man to leave; Detective Howe and Officer English then conducted a protective sweep since firearms had previously been recovered from inside the apartment (Tr. at 24, 57; Court's Exh. 14). The second uniformed officer stood outside with Defendant (Tr. at 57). No one else was present in the apartment and no dangerous objects were seized (Tr. at 24).

37.    When the transport vehicle arrived, Defendant was escorted to the rear of the vehicle (Tr. at 24). Nine hundred and five dollars were recovered from Defendant's pocket during a search of his person (Tr. at 24-25; Court's Exh. 14; Court's Exh. 15). The driver of the transport vehicle counted the money and ultimately released it to Detective Howe (Tr. at 25; Court's Exh. 14). While she was counting the money, Detective Howe asked Defendant if he had anything illegal inside his apartment (Tr. at 25; Court's Exh. 14). Defendant stated that he did not (Tr. at 25, 54; Court's Exh. 14). Detective Howe then asked for consent to search the apartment and Defendant verbally granted consent (Tr. at 25; Court's Exh. 14).

38.    Within one or two minutes of giving consent, Defendant spontaneously stated he wanted to be honest and that he did, in fact, have methamphetamine inside his apartment (Tr. at 25, 53-55; Court's Exh. 14). Detective Howe read Defendant his

16

<u>Miranda</u> rights (Tr. at 25-26; Court's Exh. 14). He then asked Defendant again whether he had methamphetamine, to which Defendant replied that he did (Tr. at 26; Court's Exh. 14). Defendant also gave consent for police to search his apartment (Tr. at 26; Court's Exh. 14).

39. Although the camera in the rear holding area of the transport vehicle recorded Detective Howe's interaction with Defendant, their conversation was not audible; all that can be heard is the driver counting the money (Tr. at 65, Court's Exh. 14). In order to memorialize the conversation on video, Detective Howe moved Defendant in front of one of the uniformed police officers' patrol car and, using the camera on his car, recorded a statement in which he stated that he had <u>Mirandized</u> Defendant, Defendant stated that he had consented to a search, and admitted to having methamphetamine in his apartment (Tr. at 26, Gvt. Exh. 6; Court's Exh. 14).

40. Next, the officers took Defendant back into his apartment where Defendant directed them to a leather jacket hanging in the closet of his bedroom (Tr. at 28; Court's Exh. 14). Defendant told the officers that there was methamphetamine in the jacket's pocket (Tr. at 28). The officers recovered a bag that contained three smaller bags of methamphetamine (Tr. at 28; Court's Exh. 14). Defendant also pointed out scales that were located on top of his dresser (Court's Exh. 14).

41. Defendant did not appear to Detective Howe to be under the influence of any drugs, narcotics or alcohol on October 18, 2005 (Tr. at 28). All conversations between Detective Howe and Defendant were conducted in English (Tr. at 28). Defendant

17

responded appropriately in English to all questions asked of him; at no time did he ever indicate he needed to explain something in Spanish (Tr. at 28).

42. Defendant testified at the suppression hearing that he was high on methamphetamine when he was taken into custody on both September 29, 2005, and on October 18, 2005 (Tr. at 72-73). He stated he was nervous during the interviews because he had just finished doing a line (Tr. at 79). Defendant explained that he had plates with methamphetamine on them in the kitchen and in his bedroom so he could do lines; he said police took some plates from his apartment on September 29, 2005, as evidence of what he was doing (Tr. at 80).

43. Defendant further testified Spanish was his primary language, but that he was able to speak broken English (Tr. at 73-74, 79, 82). However, he often provided answers, or portions of answers, in English during the hearing (See, e.g., Tr. at 79, 80, 81, 82, 83, 85). He also stated that he was able to understand Detective Howe during their conversations (Tr. at 82).

44. Defendant is fifty-two years old and has been in the United States since September of 1976 (Tr. at 81). During his thirty years in the country, Defendant has had an opportunity to speak with people in the English language (Tr. at 81). Defendant works in the wallpaper business and speaks to his clients about the respective jobs in English (Tr. at 81).

45. On January 11, 2006, Dr. John H. Wisner conducted a court-ordered psychiatric examination of Defendant following Defendant's request for a competency evaluation (Def. Exh. 1). Dr. Wisner diagnosed Defendant with (a)

18

methamphetamine abuse and dependence, and (b) psychosis (hallucinations) due to methamphetamine intoxication, resolved.

## III. LEGAL ANALYSIS

Defendant seeks to suppress statements he made to Detective Howe on October 18, 2005, and all physical evidence obtained pursuant to the consent search. He argues that methamphetamine intoxication, psychosis due to long-term methamphetamine use, and difficulty understanding the English language prevented him from voluntarily waiving his Miranda rights and caused him to involuntarily consent to a search of his apartment. Defendant also challenges admission of his statements that he possessed methamphetamine, on the bases that his initial statement was un-Mirandized and the second was made so quickly afterward.

### A. Statements

Defendant seeks to suppress statements made both before and after he was advised of his Miranda rights. He contends that his initial admission of methamphetamine possession should be suppressed since it was made before he was Mirandized. He claims his second admission should also be suppressed since it was made so close in time to the unwarned custodial interrogation. Finally, Defendant argues that he involuntarily waived his Miranda rights.

### 1. Pre-Miranda Statement

In Miranda v. Arizona, the United States Supreme Court held that in order for statements obtained during a custodial interrogation to be used at trial, law enforcement officers must have first advised the defendant of his or her Constitutional rights. 384 U.S. 436, 444 (1966). Miranda warnings are thus only required when a suspect (1) is in custody and (2) is subjected to interrogation. United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992); Butzin v. Wood, 886 F.2d 1016,

19

1018 (8th Cir. 1989)(citing Rhone Island v. Innis, 446 U.S. 291, 300 (1980)). For purposes of Miranda, an "interrogation" refers to "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect." United States v. McLaughlin, 777 F.2d 388, 391 (8th Cir. 1985)(citing Innis, 446 U.S. at 301). Spontaneous statements or statements made voluntarily, as opposed to those made in response to interrogation, are admissible regardless of whether Miranda warnings were given. See, e.g., United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005); United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998)(quoting United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995)); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996); Lawrence, 952 F.2d at 1035; United States v. Waloke, 962 F.2d 824, 829 (8th Cir. 1992); Butzin, 886 F.2d at 1018.

Here, Defendant's initial admission of methamphetamine possession was not the product of police interrogation. On his own initiative, Defendant told Detective Howe he wanted to be honest and stated that he had methamphetamine inside his apartment. Defendant's statement was made spontaneously, rather than in response to any question asked by Detective Howe. As a result, this statement falls outside the reach of Miranda and should not be suppressed.

## 2. Post-Miranda Statements

In order to use a defendant's statements that were made during custodial interrogation, the government must prove that the law enforcement officer to whom the statement(s) were made first informed the defendant of his right against self-incrimination and obtained a waiver from the defendant of that right. Miranda, 384 U.S. at 444. When evaluating whether custodial statements are admissible, a court must engage in a two-step analysis. First, the defendant's waiver must have been voluntarily, knowingly and intelligently given in order to be valid.

20

United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994). If the waiver is found valid, the court must then ascertain whether the defendant voluntarily made the statements at issue. Colorado v. Connelly, 479 U.S. 157, 169 (1986).

### *Voluntary, Knowing and Intelligent Waiver*

_____A waiver is "voluntary" if it is the defendant's "free and deliberate choice," and made without "intimidation, coercion or deception." Id. at 170. For the waiver to be "knowing" and "intelligent," a defendant must have a "full awareness" of the nature of his right against self-incrimination and understand the consequences of waiving that right. Moran v. Burbine, 475 U.S. 412, 420 (1986). The court looks to the totality of the circumstances surrounding the defendant's interrogation in determining whether his waiver was valid. Id. at 421. Relevant factors include: (1) the defendant's background, experience and conduct, id.; (2) whether the defendant expressly stated that he was waiving his rights, North Carolina v. Butler, 441 U.S. 369, 373 (1979); and (3) any language difficulties encountered by the defendant during custodial interrogation, see United States v. Contreras, 372 F.3d 974, 977-78 (8th Cir. 2004); United States v. Marrero, 152 F.3d 1030, 1034 (8th Cir. 1998). A waiver made while under the influence of drugs is not involuntary per se. United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998); see also Contreras, 372 F.3d at 977.

In this case, Defendant verbally waived his Miranda rights after they were read to him by Detective Howe in English. Because the initial recitation and subsequent waiver of rights was not captured by the transport vehicle's video camera, Detective moved Defendant in front of a patrol car so as to memorialize Defendant's waiver. There, he recorded a statement that he previously advised Defendant of his Miranda rights. When Detective Howe next asked

21

Defendant whether he had waived his rights, Defendant responded "yes." I find that neither Defendant's alleged methamphetamine intoxication, psychosis due to long-term methamphetamine use, nor lack of understanding of the English language invalidates this waiver. Each argument will be addressed in turn.

First, there is conflicting evidence concerning whether Defendant was under the influence of methamphetamine at the time he waived his Miranda rights. Defendant testified that he was high when taken into custody on October 18, 2005. Although Detective Howe knew from his contact with Defendant on September 29, 2005, that Defendant was a habitual methamphetamine user, he testified that Defendant did not appear to be under the influence of drugs, narcotics or alcohol on October 18, 2005, when taken into custody.

I find the testimony of Detective Howe to be more credible than that of Defendant. At the time of this encounter, Detective Howe had thirteen years of experience with the Independence Police Department. He had served as a detective for three years and conducted hundreds of interviews with subjects who were methamphetamine users, and could distinguish users who were under the influence at the time of the interviews from those who were not. By contrast, Defendant's testimony surrounding the events that transpired on October 18, 2005, was less than clear. He was generally confused as to which events happened on that date and which events occurred on September 29, 2005. He also testified that he had only previously committed misdemeanors, but later admitted to having been convicted of illegal reentry into the United States. Therefore, I give more weight to the testimony of Detective Howe and find that Defendant's waiver was not involuntary due to methamphetamine intoxication.

22

Defendant next argues that the ill effects of long-term methamphetamine use rendered him incapable of voluntarily waiving his Miranda rights. At the hearing, Defendant offered by stipulation the testimony of Dr. John H. Wisner. Dr. Wisner performed a competency evaluation on Defendant and diagnosed him with (1) methamphetamine abuse and dependence, and (2) psychosis (hallucinations) due to methamphetamine intoxication, resolved. Importantly, this testimony does not specify the time frame during which Defendant suffered from methamphetamine-induced hallucinations and certainly does not establish that Defendant was hallucinating on October 18, 2005, when he waived his Miranda rights. As stated above, Detective Howe testified Defendant did not give any indication he was under the influence at the time. Defendant's waiver should not be invalidated on this ground.

Finally, Defendant argues that his lack of understanding of the English language prevented a voluntary, knowing and intelligent waiver of his Miranda rights. Defendant contends that his primary language is Spanish and he was thus unable to fully understand the rights he was waiving since his rights were read to him in English. I am unpersuaded by this argument. Defendant responded appropriately in English to all of Detective Howe's questions. He never indicated that he needed to explain anything in Spanish. Detective Howe believed English to be Defendant's primary language. Moreover, Defendant has been in the United States for thirty years and has been able to effectively communicate with others in English as part of his profession. Review of Defendant's testimony at the hearing as well as of the tape-recorded interviews from September 29, 2005, reveals that Defendant can successfully understand and speak the English language. Defendant's waiver of his Miranda rights should, therefore, be found valid and his statements should not be suppressed on this ground.

23

*Voluntary Statements*

A statement is voluntarily given when, in light of the totality of the circumstances, the defendant made the statement on his own accord rather than as a result of succumbing to improper pressure from law enforcement officers. See Davis v. North Carolina, 384 U.S. 737, 739 (1966). In determining if a statement was voluntarily given, courts consider whether the statement "was extracted by threats, violence or direct or implied promises, such that the defendant's 'will [was] overborne and his capacity for self-determination critically impaired.'" United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (citations omitted).

Here, Defendant's statements were voluntarily given. Nothing indicates that Defendant's statements were not made of his own free will. Detective Howe simply asked Defendant whether he had methamphetamine in his apartment and sought consent for police to conduct a search of the apartment. He did not threaten, use violence toward, or make promises to Defendant in order to elicit his responses. As a result, I find that Defendant's will was not overborne and that he retained his capacity for self-determination.

**B.      Consent**

The Fourth Amendment prohibits unreasonable searches and seizures of an individual's residence. U.S. CONST. amend. IV; see also Illinois v. Rodriguez, 497 U.S. 117, 183 (1990). This prohibition does not apply, however, when the individual whose residence was searched gave law enforcement officers valid consent to do so. United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998). In order to be valid, consent must be knowingly and voluntarily given. United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)

The voluntariness of consent is "a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973). The government bears the burden of proving by a preponderance of the evidence that the consent was valid. Cedano-Medina, 366 F.3d at 684. Characteristics relevant in determining whether voluntary consent was given include:

> (1) [the individual's] age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

United States v. -Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citations omitted). A defendant's ability to understand the language in which consent was requested should also be considered. See United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). Moreover, the environment in which consent was given should also be analyzed. Chaidez, 906 F.2d at 380. The court should consider whether the individual:

> (1) was detained for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Case 4:05-cr-00371-DW   Document 80   Filed 06/12/06   Page 25 of 27

Id.  These factors "should not be applied mechanically, and no single factor is dispositive or controlling."  United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (citation omitted).

In this case, the totality of the circumstances demonstrate that Defendant's consent was voluntarily given.  Defendant's personal characteristics do not indicate that his consent was involuntary.  At the time of consent, Defendant was 51 years old.  He verbally consented to the search of his apartment after having been advised of his Miranda rights and later reaffirmed this consent on video.  For the same reasons that neither Defendant's alleged methamphetamine intoxication, psychosis resulting from long-term methamphetamine use, nor lack of understanding of the English language rendered Defendant's waiver of his Miranda rights involuntary, I also find that they did not prevent Defendant from giving knowing, intelligent and voluntary consent for police to search his apartment.

Similarly, I find that the environment in which Defendant granted consent does not demonstrate his consent was involuntarily given.  Defendant gave consent near the back of the transport vehicle parked on the street outside his apartment.  He did so in the presence of Detective Howe and the driver of the transport vehicle while in custody.  Detective Howe did not threaten, physically intimidate, or punish Defendant.  He did not make any promises or misrepresentations upon which Defendant could have relied.  Importantly, after granting consent, Defendant directed police to the leather jacket in his bedroom closet that contained methamphetamine and pointed out scales located on top of his dresser.  I find that Defendant's consent for police to search his apartment was voluntarily given.

For the above-stated reasons, it is

26

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Evidence and Statements Obtained on October 18, 2005.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 9, 2006

Case 4:05-cr-00371-DW   Document 80   Filed 06/12/06   Page 27 of 27